UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

BRENDA WHITLOW,

                              Plaintiff,

               -vs-                                          03-CV-0005C(SC)

VISITING NURSE ASSOCIATION OF WESTERN
NEW YORK

                              Defendant.

_____

APPEARANCES:    RICHARD H. WYSSLING, ESQ., Buffalo, New York, for Plaintiff.

                HARTER, SECREST & EMERY (AMY L. HEMENWAY, ESQ., of
                Counsel), Buffalo, New York, for Defendants.


        In this action, plaintiff Brenda Whitlow brought suit alleging discrimination in the

terms and conditions of her employment with the Visiting Nurse Association of Western

New York ("VNA"), in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. §§ 2000e-2000e-17, and the Americans With Disabilities Act ("ADA"), 42 U.S.C.

§§ 12112-12117.  The VNA has moved for summary judgment (Item 17) pursuant to Rule

56 of the Federal Rules of Civil Procedure.  For the reasons that follow, defendant's motion

is granted.


## BACKGROUND

        Plaintiff, an African-American, was originally hired in 1990 by Episcopal Home Care

as a business office clerk.  She became an employee of the VNA in 1998 when several

independent hospitals and health care organizations combined to form Kaleida Health

("Kaleida").  The VNA provides home health services to residents in the Western New York area (Deft's Local Rule 56.1 Statement, Item 21, ¶¶ 1-2, 8).

Plaintiff initially held the position of Insurance Specialist in the VNA's Central Intake Department.  Following a short-term leave of absence from May 4 through June 1, 2000, she was transferred from Central Intake to VNA's Finance Department, where she assumed the position of Billing/Collections Analyst.[1]  She was assigned to durable medical equipment ("DME") billing and reported to Roseann DiSalvo, Accounts Receivable Coordinator, and Louise Varga, Accounts Receivable Manager (Item 21, ¶¶ 9).  Plaintiff's initial responsibilities in the Finance Department included posting cash payments received from insurance companies and/or patients against outstanding accounts and balancing cash ledgers (DiSalvo Decl., Item 19, ¶ 17).  She would also "pitch in" to help out others by doing some light filing and loading the printers with paper or ribbons (Whitlow Dep., Appx. E, pp. 29-32).[2]

On November 7, 2000, at the conclusion of her trial period in the Finance Department, plaintiff received a formal evaluation of her work performance.  The evaluation was conducted by Ms. DiSalvo, who rated plaintiff's performance of her cash-posting duties as "marginal" and identified problems with meeting monthly deadlines and balancing cashbooks.  Plaintiff was instructed to prepare a daily log of her work and to report her progress on a weekly basis (Item 19, ¶ 20; Appx. K).  At her deposition, plaintiff admitted

---

[1]The transfer was the result of the negotiated settlement of a charge filed with the Equal Employment Opportunity Commission ("EEOC") in early 2000 by Ms. Whitlow and another African-American woman alleging racial discrimination in the Central Intake Department (*see* Whitlow Aff., Item 31 ¶¶ 8 - 10; Item 22, Ex. J).

[2]References to "Appx." are to the Appendix of Exhibits A through U attached to Defendant's Local Rule 56.1 Statement of Undisputed Issues of Material Fact, Items 21-24.

that at the time the evaluation was written, she was having problems entering cash and meeting deadlines (Appx. E, p. 73).

On December 18, 2000, Ms. DiSalvo conducted a second evaluation of plaintiff's work performance.   Once again, plaintiff received a "marginal" rating based on her continued problems with meeting deadlines, balancing cashbooks, and "many errors in posting cash" (Appx. L; Item 19, ¶ 21).  When asked at her deposition whether she agreed with Ms. DiSalvo's comments on the evaluation, plaintiff testified, "[S]he was right.  My work was off" (Appx. E, p. 75; *see also* Whitlow Aff., Item 31, ¶ 32).

In approximately February 2001, when plaintiff had not shown improvement in her job performance, Ms. DiSalvo assigned most of plaintiff's cash-posting duties to another Finance Department employee, Donna Baker.  Plaintiff was reassigned to other tasks within the DME billing area, including preparation and mailing of bills for "Lifeline" accounts and addressing inquiries about those bills (Item 19, ¶ 25; Appx. E, p. 56).

At around the same time, plaintiff informed Ms. DiSalvo and other co-workers that she had been diagnosed with Graves' disease[3] (Item 19, ¶ 27; Appx. E, p. 18).  On April 5,

---

[3]According to the on-line service WebMD Health:

Graves' disease is an autoimmune disorder that affects the thyroid gland, which produces hormones that control many of the body's chemical functions.  Graves' disease causes the thyroid gland to produce too much thyroid hormone (hyperthyroidism), which may make a person's heart pound and beat irregularly and may cause nervousness, mood changes, weakness, and fatigue.

Signs and symptoms of Graves' disease include diarrhea, rapid heart rate, inability to tolerate heat, and weight loss.

Graves' disease is the most common cause of hyperthyroidism. It tends to run in families, and it affects women more often than men. It can develop at any age but most commonly affects people between the ages of 30 and 50. Graves' disease may be triggered by severe emotional stress, such as the death of a loved one or being involved in an automobile accident.

2001, plaintiff's physician, Suzanne Eppley, M.D., signed a form stating that plaintiff "is not to work in stressful situation[s] and not more than 40 hours a week" (Appx. M, p. 1).  The next day, on April 6, 2001, Ms. Whitlow submitted a request for "intermittent" leave of absence under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, due to a "serious health condition that makes [her] unable to perform [her] job" (*id.* at 2). In support of this request, Dr. Eppley submitted a "Certification of Health Care Provider," stating that plaintiff suffered from Graves' disease, weight loss, depression, and anxiety. The condition was diagnosed in February 2001, but could have commenced as early as May 2000 due to stress at work and was reasonably expected to continue for six months to one year.  Dr. Eppley also indicated the reasonable probability that plaintiff would need thyroid surgery, medication, frequent lab work, and doctor visits during the duration of her medical condition (*id.* at 4-5).

In a memorandum dated May 7, 2001, the VNA notified plaintiff that her request for intermittent FMLA leave had been approved, subject to medical re-certification every thirty days (*id.* at 2; *see also* Item 19, ¶¶ 28, 29; Moran Decl., Item 20, ¶ 22).  In a note dated June 1, 2001, Dr. Eppley reported that plaintiff "is seen here for health care.  She can only work 40 hours a week" (Appx. N, p. 1).  Plaintiff saw Dr. Eppley on June 14, 2001, and Dr. Eppley reported: "cannot work any overtime up to 40 hours/wk. maximum due to Grave's disease" (*id.* at 2).

On September 27, 2001, Ms. DiSalvo conducted a further evaluation of plaintiff's work performance, once again giving her an overall rating of "marginal" and noting her

---

http://my.webmd.com/hw/health_guide_atoz/stg124253.asp

inability to focus and to work independently (*id.*, Ex. O; Item 19, ¶ 32).  Plaintiff testified at her deposition that she agreed with the comments in the evaluation, admitting that she was "messing up the work" (Appx. E, p. 76).

Shortly thereafter, in early October 2001, Ms. DiSalvo met with Ms. Varga regarding plaintiff's performance.  After examining plaintiff's strengths and weaknesses, Ms. DiSalvo and Ms. Varga decided to remove plaintiff's remaining cash-posting duties and reassign her to preparing state aid applications (which included filling out forms and mailing them to the appropriate county to obtain reimbursement).  According to Ms. DiSalvo, this was done as part of a restructuring of duties within the Finance Department to accommodate the maternity leave of co-worker Maria Wright (Item 19, ¶¶ 34, 35; Appx. E, p. 55).  As a result, as of October 2001 plaintiff's job duties consisted of performing Lifeline billing functions and preparing state aid applications (Item 19, ¶ 38).  Plaintiff testified that she spent approximately 15 hours per week performing each of these two functions (Appx. E, pp. 79-80, 151).

Plaintiff took a medical leave of absence for approximately two weeks in late November and early December 2001, when she underwent laser surgery to remove her thyroid (Item 31, ¶ 87; Item 19, ¶ 43).  Upon returning to work, she continued to have problems performing her assigned duties.  As a result, on December 31, 2001, Ms. DiSalvo and Ms. Varga met with plaintiff to inform her that they had decided to place her on a 45-day performance improvement plan.  Also present at that meeting were Joanne Cyran and Joanna Wyzykowski, appearing on plaintiff's behalf as representatives of her union, Communication Workers of America ("CWA"), Local 1122, AFL-CIO (Item 19, ¶ 49).

The performance improvement plan listed the following four aspects of plaintiff's state aid application work which needed improvement:  (1) accurate completion of forms; (2) mailing the forms to appropriate parties; (3) maintaining accurate files for the forms; and (4) timely follow-up on incomplete or inaccurate paperwork (*see* Appx. Q).  The plan required plaintiff to follow all directions for completion of the state aid applications, and to submit all paperwork to Ms. DiSalvo for review prior to its being sent out.  The plan also called for achievement of a 90-percent accuracy rate within the 45-day period, and for weekly meetings between plaintiff and Ms. DiSalvo to review plaintiff's progress and to address any performance-related concerns (*id.*; *see also* Item 19, ¶ 48).  Attached to the plan were several copied pages of incomplete or incorrect paperwork processed by plaintiff (*id.*).

During the December 31, 2001 meeting, Ms. DiSalvo explained the purpose of the performance improvement plan to plaintiff, and advised her that she and Ms. Varga would work with her directly to review all of her work and to provide additional training as needed (Item 19, ¶ 45; Item 20, ¶ 25).  At the conclusion of the meeting, plaintiff refused to sign the performance improvement plan (Item 19, ¶ 53; Item 31, ¶ 118).  Instead, she immediately filed a written grievance with the union, claiming that she was wrongfully required to attend an unscheduled disciplinary meeting without advance notice and without the opportunity to select her own union representatives (*see* Appx. S).  She also claimed that she was given a performance improvement plan while on medical restrictions due to her Graves' disease and thyroid condition (*id.*).  Pursuant to the grievance procedures in the Master Agreement between Kaleida and the CWA, a "first step" meeting was held on January 24,

2002 (*id.*; *see also* Appx. I, Article 7).  On January 28, 2002, the VNA denied the grievance (Appx. S, p. 3; *see also* Item 20, ¶ 28).

Meanwhile, plaintiff commenced a disability leave of absence on January 9, 2002 (Item 19, ¶ 54; Item 20, ¶ 26; Appx. E, pp. 113-14).  She remained out of work on disability leave until she resigned from the VNA effective July 15, 2002 (Item 20, ¶ 27; Wyssling Aff., Item 34, Ex. G).

On or about April 29, 2002, plaintiff filed a charge of discrimination with the EEOC, in which she claimed that she was unfairly disciplined and denied a reasonable accommodation because of her race (African-American) and disability (Graves' disease), and in retaliation for having filed a prior charge of discrimination, all in violation of the ADA and Title VII (Appx. A).  The EEOC issued a "Dismissal and Notice of Rights" on October 9, 2002, stating that the EEOC had conducted an investigation of the charge but was "unable to conclude that the information obtained establishes violations of the statutes" (Appx. B).

Plaintiff subsequently filed a claim for Workers' Compensation benefits, alleging stress-related injuries resulting from racial discrimination and harassment in the workplace. A hearing on this claim was held before the New York State Workers' Compensation Board on May 4, 2003, at which plaintiff testified and was represented by counsel (Item 20, ¶ 30). On April 15, 2003, Workers' Compensation Law Judge Steve Molik issued a "Reserved Decision" denying plaintiff's claim, stating as follows:

> Extensive testimony has been taken in this matter from the claimant and two supervisors from her work, . . . [and m]edical reports of [four physicians] are all in the Board file. . . .  I do not doubt the validity of the claimant's perception of the events at her work place.  Nor do I doubt the sincerity of claimant's complaints.  However the law is quite clear especially with respect to the burden of proving that the actions taken by the employer were other than lawful personnel decisions taken in good faith by the

> employer.  The record is clear that every opportunity was given to the claimant to improve her work performance.  The employer went out of its way to help improve the claimant's job performance.

(Appx. T).

Plaintiff sought review of this ruling, and on January 28, 2004, the Workers'

Compensation Board Panel issued a decision affirming the denial of the claim, stating as

follows:

> [T]he claimant's stress was caused by good faith personnel decisions, and was no greater than the stress experienced by similarly situated clerical workers in the medical field.
> . . .
>
> [T]he Board Panel does not credit the claimant's testimony that such an increase [in work] occurred.  Rather, the Board Panel credits [the] testimony of the claimant's supervisor that the claimant's workload was, in fact, decreased when the claimant was reassigned to billing the State for services rendered to individuals receiving State aid.  The record reflects, and the claimant conceded, that assistance and training were afforded to the claimant with respect to her new job duties . . . .
>
> . . .
>
> With respect to the claimant's medical problems, the Board Panel notes that the employer complied with the written medical restrictions submitted by the claimant to the employer.  The Board Panel notes that said restrictions merely limited the claimant to forty hours per week.

(Appx. U).  Plaintiff did not seek further review of the Board Panel's decision.

This federal court action was commenced by plaintiff *pro se* on January 6, 2003, by

the filing of a form complaint against the VNA alleging employment discrimination in

violation of Title VII and the ADA (Item 1).  In paragraph 13 of the form, plaintiff checked

the following "types of actions by the defendants" forming the basis for the complaint:

> a.   ___✓___   Failure to provide me with reasonable accommodations to the application process
> . . .

c. __✓__      Termination of my employment

. . .

e. __✓__      Failure to provide me with reasonable accommodations so I can
             perform the essential functions of my job

. . .

g. __✓__      Harassment on the basis of unequal terms and conditions of my
             employment

(*id.*).  The VNA filed its answer on April 24, 2003 (Item 6).

Upon completion of discovery, the VNA moved for summary judgment primarily on the grounds that: (1) plaintiff's claims of harassment and constructive discharge are either unexhausted or insufficient as a matter of law; and (2) plaintiff has failed to come forward with sufficient admissible evidence to sustain her claims of race or disability discrimination under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (*see generally* Item 25).  Oral argument was heard by the court on June 27, 2005. For the following reasons, defendant's motion is granted.

## DISCUSSION

**I.     Summary Judgment Standards**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In considering a motion for summary judgment, the court's function is not to resolve contested issues of fact, but rather to determine whether there exist any disputed issues

of material fact for trial. *LaFond v. General Physics Services Corp.*, 50 F.3d 165, 171 (2d Cir. 1995); *Williams v. City of New York*, 2005 WL 839103, at *3 (S.D.N.Y. April 12, 2005).

The party seeking summary judgment has the burden to demonstrate that no genuine issues of material fact exist. *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 253 (2d Cir. 2002). In determining whether the movant has met this burden, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Stated more succinctly, '[t]he evidence of the non-movant is to be believed.'" *Id.* at 253-54 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, the non-movant must do more than simply show "some metaphysical doubt as to the material facts" in order to defeat a summary judgment motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial" on an essential element of her case–*i.e.*, one on which she has the burden of proof. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 323; *see also Weinstock v. Columbia University*, 224 F.3d 33, 41 (2d Cir. 2000) (at summary judgment, "[t]he time has come . . . 'to put up or shut up.'") (citation omitted), *cert. denied*, 580 U.S. 811 (2003).

As the Second Circuit has repeatedly recognized, summary judgment is "ordinarily inappropriate" in employment discrimination cases, since the employer's intent and state of mind are usually matters of disputed fact. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir.), *cert. denied*, 530 U.S. 1261 (2000); *see also Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994); *Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 103 (2d Cir. 1989). In such cases,

summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial.  There must either be a lack of evidence in support of the plaintiff's position, or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error.

*Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 54 (2d Cir. 1998) (citations omitted).

Nonetheless, summary judgment may be appropriate where the plaintiff's admissible evidence fails to "show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination."  *Stern v. Trustees of Columbia University*, 131 F.3d 305, 312 (2d Cir. 1997).  As the Second Circuit stated in *Weinstock v. Columbia University*:

[T]he salutary purposes of summary judgment--avoiding protracted, expensive and harassing trials--apply no less to discrimination cases than to other areas of litigation.  Just a few short years ago we went out of our way to remind district courts that the impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable.  The Supreme Court has also recently reiterated that trial courts should not "treat discrimination differently from other ultimate questions of fact."

*Weinstock*, 224 F.3d at 41 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); other citations and quotations omitted)).

With these standards as a background, the court now turns to a discussion of the VNA's motion for summary judgment seeking dismissal of the complaint in its entirety on the following grounds:

1.      Plaintiff failed to exhaust her administrative remedies with respect to her claims of harassment and constructive discharge;

2.      Plaintiff has failed to establish a *prima facie* case of disability discrimination under the ADA;

-11-

3.      Plaintiff has failed to establish race or disability discrimination under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*; and,

4.      Even if exhausted, the harassment and constructive discharge claims fail as a matter of law.

## II.      Exhaustion of Administrative Remedies

A plaintiff may bring an employment discrimination action under Title VII or the ADA in federal court only after exhausting administrative remedies by filing a timely charge with the EEOC or with "a State or local agency with authority to grant or seek relief from such practice." 42 U.S.C. § 2000e-5(e) (Title VII); *see* 42 U.S.C. § 12117(a) (incorporating Title VII's procedural requirements into the ADA); *see also Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 82-83 (2d Cir. 2001). The purpose of the exhaustion requirement is to encourage settlement of discrimination disputes through conciliation and voluntary compliance at the administrative level, which "would be defeated if a complainant could litigate a claim not previously presented to and investigated by the EEOC." *Miller v. International Tel. & Tel.*, 755 F.2d 20, 26 (2d Cir.), *cert. denied*, 474 U.S. 851 (1985).

Since exhaustion of administrative remedies is a precondition to suit, *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000), a plaintiff typically may only raise in a federal district court complaint claims that were either expressly included in or are "reasonably related to" the allegations contained in the EEOC charge. *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993) (internal quotation marks omitted) (superseded on other grounds). The Second Circuit has recognized three

situations in which claims raised for the first time in the district court may be found to be "reasonably related" to allegations in an EEOC charge:

> 1) where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination; 2) where the complaint is one alleging retaliation by an employer against an employee for filing an EEOC charge; and 3) where the complaint alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.

*Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003) (citations and internal quotation marks omitted).

The court's inquiry in determining whether the allegations of a federal complaint are "reasonably related" to those contained in the EEOC charge focuses on the facts giving rise to the claim of discrimination. *Cooper v. Xerox Corp.*, 994 F. Supp. 429, 432 (W.D.N.Y. 1998). "[T]he factual allegations in the EEOC charge, rather than any legal theories stated therein, should be the focus for determining whether a cause of action is reasonably related to the plaintiff's EEOC charge." *Bridges v. Eastman Kodak Co.*, 822 F. Supp. 1020, 1026 (S.D.N.Y. 1993); *see also Wiley v. Citibank, N.A.*, 2000 WL 122148 (S.D.N.Y. February 1, 2000) (failure to exhaust where "[p]laintiff alleged factually distinct discriminatory practices in her constructive discharge claim that would require an investigation of events differing in time and nature" from scope of agency investigation); *Tart v. Hill Behan Lumber Co.*, 31 F.3d 668, 673 (8th Cir. 1994) (failure to exhaust where alleged incidents of racial harassment were "separate in time and distinct in kind" from alleged incident of discriminatory discharge).

In this case, the VNA contends that to the extent plaintiff has alleged "termination of [her] employment" and "harassment on the basis of unequal terms and conditions of

[her] employment" in her *pro se* complaint (Item 1, ¶ 13(c), (g)), those claims are not reasonably related to her charges before the EEOC and should be dismissed for failure to exhaust administrative remedies.  As set forth above, in her EEOC charge filed on April 29, 2002, plaintiff claimed that she was unfairly disciplined and denied reasonable accommodation because of her race and disability, and in retaliation for having filed a prior charge of discrimination.   Specifically, in the space provided on the EEOC form for describing the particulars of the charge, plaintiff stated:

> I am a qualified individual with a disability. . . . In or around October 2001, Respondent assigned me to new duties that had previously been accomplished by four individuals.  In early December 2001, I informed my supervisor of my inability to due [sic] the job, because of stress, which exacerbated my medical condition.  On or about December 31, 2001, I [was] written up for poor performance and placed on an improvement plan.

> I believe that I have been unfairly disciplined and denied a reasonable accommodation because of my race/black, disability, and in retaliation for having previously filed an EEOC complaint in violation of the [ADA] and [Title VII].

(Appx. A).

With respect to plaintiff's claim that the VNA terminated her employment, it is undisputed that at the time the EEOC charge was filed in April 2002, plaintiff was on an extended disability leave of absence.  She did not return to work prior to her resignation in July 2002.  Based on these facts, plaintiff's "termination" claim, to be viable, must be construed as a claim for constructive discharge–*i.e.*, that the VNA deliberately created working conditions that were "so difficult or unpleasant that a reasonable person in the [plaintiff]'s shoes would have felt compelled to resign."  *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119  (1st Cir. 1977), *quoted in Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987).

Notwithstanding that plaintiff was represented at the administrative level by the same counsel who now represents her in this action, and that an amendment of either the EEOC charge or the complaint (or both) might have provided plaintiff or her counsel the appropriate opportunity to clarify the factual predicates for her constructive discharge and harassment claims, the court finds those claims to be within the scope of the investigation which could reasonably be expected to stem from the matters set forth in the administrative charge.  Liberally construed, the facts investigated by the EEOC in connection with plaintiff's charge that the stress brought on by her increased work duties in the latter months of 2001 exacerbated her medical condition and rendered her unable to do her job could reasonably be expected to encompass the same facts necessary to support a claim that her supervisors at the VNA made her working conditions so difficult or unpleasant that a reasonable person would have felt compelled to resign in July 2002.  Likewise, the EEOC's investigation of the facts supporting plaintiff's charge that she was assigned a job in October 2001 which was previously accomplished by four people could reasonably be expected to encompass the same facts necessary to support her claim that she suffered harassment on the basis of unequal terms and conditions of her employment.

Certainly, much of the difficulty involving the question of exhaustion of administrative remedies could have been avoided by amendments, with the aid of counsel, amplifying the facts set forth by the plaintiff her *pro se* filings.  However, the court hesitates to penalize plaintiff for her unfamiliarity with the formalities of legal or administrative practice and pleading, especially at this stage of the proceedings where substantial discovery has taken place and the issues have been framed in the context of summary judgment.  *Cf. Cooper*, 994 F. Supp. at 434-35 (declining to dismiss hostile environment claim on exhaustion

grounds where substantial discovery had taken place on the issue, case was three years old, and claim was pleaded in original complaint).

Accordingly, defendant is not entitled to summary judgment on the ground that plaintiff failed to exhaust her constructive discharge and harassment claims.

### III.    *Prima Facie* Disability Discrimination

Under the ADA:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).   Following the order and allocation of proof for employment discrimination claims established in *McDonnell Douglas Corp. v. Green*, a plaintiff suing under the ADA bears the initial burden to produce sufficient evidence of a *prima facie* case by showing that: (1) the plaintiff's employer is subject to the ADA; (2) the plaintiff was disabled within the meaning of the ADA; (3) the plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) the plaintiff suffered an adverse employment action because of her disability.   *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004) (citing *Cameron v. Community Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003)).   The plaintiff's burden in this regard "is not onerous . . . ," *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981), and in fact, "has been frequently described as 'minimal.'" *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir. 1997) (citation omitted), *cert. denied*, 522 U.S. 1075 (1998).

Once the plaintiff has established a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *McDonnell Douglas*, 411 U.S. at 800, 802.  If the employer meets this burden, the plaintiff then must prove that the articulated justification is in fact a pretext for discrimination.  *Id.* at 804; *see also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510-11 (1993); *Norville v. Staten Island University Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999).[4]

Defendant does not dispute that it is subject to the ADA, but contends that plaintiff has failed to meet the second, third, and fourth *prima facie* elements of her ADA claim–*i.e.*, she has failed to present evidence upon which a rational trier of fact could conclude that (A) she has a disability within the meaning of the statute, (B) she requested a reasonable accommodation to enable her to perform the essential functions of her position, but the VNA refused her request, or (C) she suffered an adverse employment action because of her disability.

## A.    Graves' Disease as a "Disability" Under the ADA

The ADA defines "disability" as (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such impairment; or (3) being

_____

[4]As the Second Circuit has instructed, the district court–not the jury–must make the determination as to whether the initial *McDonnell Douglas* burdens of production have been met:

> Requiring the jury to play the ping-pong-like match of shifting burdens is confusing and entirely unnecessary because that exercise does not involve any determination of credibility. . . .

> Thus, in cases where each party has met its initial burden, as determined by the court, juries should be requested to determine only the ultimate question:  has the plaintiff proved that it is more likely than not that he or she was subjected to the adverse employment action based on an illegal discriminatory motive?

*Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 53 (2d Cir. 1998) (citing *St. Mary's Honor Ctr.*, 509 U.S. at 509, 511).

regarded as having such an impairment.  42 U.S.C. § 12101(2); *Bragdon v. Abbott*, 524 U.S. 624, 630 (1998); *see also Barr v. New York City Transit Authority*, 2002 WL 257823 (E.D.N.Y. February 29, 2002).  In *Bragdon*, the Supreme Court established a three-step approach to determining whether a particular medical condition qualifies as a "disability" under § 12102(2)(A).  First, the court must determine whether a condition is an impairment; second, the court must identify the major life activity the plaintiff relies upon; third, the court must determine whether the impairment substantially limits the major life activity.  *Bragdon*, 524 U.S. at  631.

It is beyond dispute that plaintiff's Graves' disease is an impairment.  *See Barr*, 2002 WL 257823, at *3; *see also Bonitch v. Original Honey Baked Ham Co. of the East, Inc.*, 34 F. Supp.2d 154, 158 (E.D.N.Y. 1999) (Graves' disease meets requirements of "physical or mental impairment" set forth in Department of Health and Human Services regulations at 45 C.F.R. § 84.3(j)(2)(I)).  However, "[m]erely having an impairment does not make one disabled for purposes of the ADA."  *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 195 (2002).  The plaintiff must also demonstrate that the impairment substantially limits one or more "major life activities," defined to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  *Sutton v. United Airlines*, 527 U.S. 471, 480 (1999) (quoting 29 U.S.C. § 1630.2(I)).

As defendant points out, plaintiff has not specifically identified any major life activity which she alleges was substantially limited by her medical condition.  However, she testified repeatedly at her deposition, and states in her affidavit, that her Graves' disease

interfered with her ability to focus, concentrate, learn, and perform the duties associated with the cash-posting and billing positions assigned to her upon being transferred to VNA's Finance Department in June of 2000.  Accordingly, the court concludes that the function at issue in this case is plaintiff's ability to work, and turns to the task of determining whether plaintiff has come forward with evidence sufficient to permit a rational trier of fact to infer that her ability to work was substantially limited by her Graves' disease.  *See Bragdon*, 524 U.S. at  631; *Bonitch*, 34 F. Supp.2d at 158-59.

When making this determination, courts look to the EEOC regulations implementing the ADA, which provide that an impairment "substantially limits" a major life activity if it renders a person either:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or

> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1); *see Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998) ("While these regulations are not binding, they provide us with guidance in interpreting the ADA.").  Where the plaintiff identifies "working" as the major life activity limited by her impairment, the EEOC regulations define the term "substantially limits" more precisely:

> (3) With respect to the major life activity of working–
> (i) The term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

(ii) In addition to the factors listed in paragraph (j)(2) of this section,[5] the following factors may be considered in determining whether an individual is substantially limited in the major life activity of "working":

(A) The geographical area to which the individual has reasonable access;

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3); *see Giordano v. City of New York*, 274 F.3d 740, 747-48 (2d Cir. 2001).   As these guidelines suggest, the question whether a particular plaintiff is substantially limited in the major life activity of "working" requires an "individualized and fact-specific" inquiry, generally not well-suited for summary judgment.  *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 643 (2d Cir. 1998), *cert. denied*, 526 U.S. 1018 (1999); *see Bonitch*, 34 F. Supp.2d at 159 ("[w]hether a person with Graves' disease has an impairment which substantially limits a major life activity is a genuine issue of material fact

---

[5]Subsection (j)(2) provides:

The following factors should be considered in determining whether an individual is substantially limited in a major life activity:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2).

that a jury, not the Court, must decide."); *Fink v. Printed Circuit Corp.*, 204 F. Supp.2d 119, 125 (D.Mass. 2002) ("Whether a physical impairment constitutes a substantial limitation is often fact-dependent and not readily disposed of at the summary judgment stage.").

In this case, defendant contends that the inquiry is foreclosed by an utter lack of evidence upon which a rational juror could infer that plaintiff's Graves' disease significantly restricted her ability to perform either a class of jobs or a broad range of jobs at any time during her employment at the VNA.  According to defendant, the only reasonable inference to be drawn from the record is that plaintiff had difficulty performing the state aid application duties associated with the "single, particular job" of Billing/Collections Analyst, falling far short of the *prima facie* showing required to establish that she is a person with a disability under the meaning of the ADA.  *See Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir. 1994) ("An impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one."), *cert. denied*, 513 U.S. 1147 (1995); *Wernick v. Federal Reserve Bank of New York*, 91 F.3d 379, 383-84 (2d Cir. 1996) (finding holding in *Heilweil* consistent with the language of § 1630.2(j)(3)(I)); *Adams v. Rochester General Hospital*, 977 F. Supp. 226, 232 (W.D.N.Y. 1997) (to succeed on ADA claim, plaintiff must show his impairment substantially limited his ability to work at not only his existing job, but any job).

Indeed, the medical evidence in the record is sparse, consisting of the forms completed by Dr. Eppley in the spring of 2001 (Appx. M, N), and the affidavit of Dr. Roderick Charles, a psychiatrist who began treating plaintiff in mid-April 2002 while she was on disability leave (Item 34, Ex. K).  Dr. Eppley noted the onset of Graves' disease in

February 2001, with an expected duration of six months to one year.  The only restrictions indicated by Dr. Eppley were that plaintiff should be "limit[ed] to 40 hours work a week" with "no stressful situations" (Appx. M).

Dr. Charles' affidavit does not address plaintiff's Graves' disease at all, and makes no mention of any effect this condition might have had on plaintiff's ability to work.  Instead, Dr. Charles expresses his concern over plaintiff's complaints about being "constantly humiliated and harassed by certain of her co-workers and supervisors" (Item 34, Exh. K at ¶ 8), and her belief that "the incidents were motivated by racism" (*id*. at ¶ 9).  Dr. Charles states that he "urged [plaintiff] to resign and seek other employment, and she followed [his] advice" (*id.* at ¶ 19).

Standing alone, this scant medical evidence provides little basis for a rational juror to infer that plaintiff's impairment significantly restricted her ability to perform a class or broad range of jobs at VNA.  *See Adams*, 977 F. Supp. at 232 (W.D.N.Y. 1997) (rejecting ADA claim where plaintiff failed to provide any medical evidence to suggest that his ability to work was substantially limited by his impairment); *accord Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1319 (8th Cir. 1996) (affirming district court's grant of summary judgment in employer's favor where plaintiff failed to produce evidence indicating that medical condition significantly restricted his ability to perform any of the basic functions enumerated in 29 C.F.R. § 1630.2(I)).  However, considering this proof in conjunction with the other evidence in the record, and drawing all reasonable inferences in plaintiff's favor, the court cannot conclude as a matter of law that no rational juror could find in plaintiff's favor at the *prima facie* stage of her case.

-22-

For example, plaintiff's evaluations clearly indicate that she had trouble performing her job duties from the outset of her reassignment to the Finance Department in June 2000.  Those duties initially included, among other things, posting cash payments against outstanding accounts and balancing cash ledgers.  She was later reassigned to preparing and mailing bills for Lifeline accounts, and in October 2001–after defendant was made aware of her medical condition–was given the additional duties of completing the state aid applications.  She testified at her deposition that she did not receive adequate training for the state aid functions, and that she "didn't have the confidence to take on a new job at that point" (Appx. E, pp. 86-87).  She also testified that she became very forgetful at work, was unable to focus and concentrate, and was unable to learn new things (*see, e.g.*, Appx. E, pp. 20, 24-25, 73, 84).

When read in the light most favorable to plaintiff, this record suggests circumstances sufficient to permit a rational finder of fact to infer that the duties assigned to plaintiff in her position as Billing/Collections Analyst in the VNA's Finance Department encompassed "a class of jobs or a broad range of jobs in various classes" within the meaning of  29 C.F.R. § 1630.2(j)(3)(I), and that her Graves' disease significantly restricted her ability to perform those duties.  Accordingly, defendant is not entitled to summary judgment on the ground that plaintiff has failed as a matter of law to establish the first element of her *prima facie* claim of disability discrimination under the ADA.

## B.    Reasonable Accommodation

Defendant also contends that plaintiff has failed to produce any evidence tending to show that she required a reasonable accommodation to enable her to perform the

essential functions of her position, or that the VNA refused her request for such an accommodation.   The term "reasonable accommodation" is defined in the ADA as including, but not limited to, "job restructuring, part-time or modified work schedules, reassignment to a vacant position, . . . training materials or policies, . . . and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B).  In addition, the EEOC regulations provide that employers are required to make "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position."  29 C.F.R. § 1630.2(o)(1)(ii); *see Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 217 (2d Cir. 2001).

Plaintiff alleges here that she requested a reasonable accommodation to enable her to perform the job of Billing/Collections Analyst, but the VNA refused her request.  She testified at her deposition (and states in her affidavit) that she repeatedly asked Ms. DiSalvo to eliminate the state aid application tasks from her job duties and reassign her to projects with which she was more familiar, but her requests fell on deaf ears (*see* Item 34, Ex. L, pp. 84-90; Item 31, ¶¶ 80-83).  Defendant responds that plaintiff's request to remove the state aid job duties does not qualify as a reasonable accommodation under the ADA, since those duties comprised an essential function of plaintiff's position in the Finance Department.  *See Shannon v. New York City Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003) ("A reasonable accommodation can never involve the elimination of an essential function of a job.").

The EEOC regulations define the term "essential functions" to mean "the fundamental job duties of the employment position the individual with a disability holds or

desires.  The term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1); *see Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998).  When called upon to assess whether a particular job function is "essential" under the ADA, the district court "must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position."  *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir.), *cert. denied*, 524 U.S. 911 (1998).  The regulations also list various types of additional evidence that should be considered in making the "essential function" determination, including (but not limited to) written job descriptions prepared before advertising or interviewing applicants for the job, the amount of time spent on the job performing the function, the consequences of not requiring the incumbent to perform the function, the terms of a collective bargaining agreement, the work experience of past incumbents in the job, and/or the current work experience of incumbents in similar jobs. 29 C.F.R. § 1630.2(n)(3).

As noted by the Second Circuit in *Shannon*, the "Interpretive Guidelines" accompanying the EEOC regulations instruct the courts "to first determine 'whether the employer actually require[d] employees in the position to perform the functions that the employer asserts are essential.'  If so, 'the inquiry will then center around whether removing the function would fundamentally alter that position.'" *Shannon*, 332 F.3d at 101 (quoting 29 C.F.R. pt. 1630 app. § 1630.2(n)).[6]  As these guidelines clearly indicate, the

---

[6]The Interpretive Guidelines further provide that the determination of whether or not a particular function is essential will generally include one or more of the following factors: (1) whether the position exists to perform a particular function, (2) the number of other employees available to perform that job function or among whom the performance of that job function can be distributed, and (3) the degree of expertise or skill required to perform the function. *See* 29 C.F.R. pt. 1630 app. § 1630.2(n).

determination "[w]hether a particular function is essential is a factual determination that must be made on a case by case basis." 29 C.F.R. pt. 1630 app. § 1630.2(n).

Once again, the record in this case illustrates the difficulty of making this factual determination at the summary judgment stage. For example, there is no written job description for the Billing/Collections Analyst position. Likewise, there is no explanation of the consequences of not requiring the person in that position to perform the state aid application function, nor is there any clear indication as to the work experience of past incumbents in the job or the current work experience of incumbents in similar jobs with respect to those duties. In this regard, Ms. DiSalvo indicates in her declaration that the state aid functions were performed by a part-time employee prior to being assigned to plaintiff. When that employee left the VNA, the state aid work was split between two employees, Maria Wright and Janice Jerome. In addition to working on state aid applications, Ms. Wright and Ms. Jerome also performed Medicare billing functions. When Ms. Wright took maternity leave, Ms. DiSalvo and Ms. Varga assigned all of the Medicare billing functions to Ms. Jerome, and all of the state aid functions to plaintiff. At the same time, plaintiff was relieved of her cash-posting duties while retaining her Lifeline billing duties. According to Ms. DiSalvo, before Ms. Wright commenced her maternity leave, she provided plaintiff with approximately eight to ten working days of training in how to complete the state aid applications. Ms. DiSalvo states that based on the work experiences of other employees, it should have taken plaintiff approximately 3-4 days per month to complete the Lifeline billing functions, leaving the remainder of her time to work on state aid applications (Item 19, ¶¶ 34-37).

For her part, plaintiff states in her affidavit that her duties as a Lifeline biller were more complex and time-consuming than other billing jobs, that employees performing billing and cash-posting functions were expected to assist with other office tasks, and that her billing work took longer to complete because she was not provided with the same tools (specifically, a rubber stamp) as were provided to the other billers who were all Caucasian (Item 31, ¶¶ 49-54).  With respect to the state aid functions, plaintiff states that when the part-time employee responsible for the state aid work left the VNA, a temporary (40-hour) employee was hired to perform that work and to help out with filing.  Then, in April or May 2001, the state aid work was reassigned to four employees, including plaintiff and Ms. Wright.  When Ms. Wright took maternity leave in the fall of 2001, plaintiff was assigned to cover those additional state aid duties as well.  Plaintiff states that she received only about eight hours of training from Ms. Wright in 1.5-hour sessions over the course of about a week (Item 31, ¶¶ 61-70).

Based on this proof, considered in the light most favorable to plaintiff while drawing all reasonable inferences in her favor, a rational juror could find that the state aid application duties did not comprise an essential function of plaintiff's Billing/Collections Analyst position in the VNA's Finance Department, and that plaintiff's request to reassign those duties could qualify as a reasonable accommodation under the ADA.  Accordingly, defendant is not entitled to summary judgment on the ground that plaintiff has failed to establish that she made a request for a reasonable accommodation to enable her to perform the essential functions of her position, but was refused.

C.     **Adverse Employment Action**

Defendant also argues that plaintiff cannot satisfy the fourth element of her *prima facie* case–*i.e.*, that she suffered an adverse employment action because of her disability. To constitute an adverse employment action in violation of the ADA or Title VII, there must be a "materially adverse" change in working conditions.  *Patrolmen's Benevolent Ass'n of City of New York v. City of New York*, 310 F.3d 43, 51 (2002), *cert. denied*, 538 U.S. 1032 (2003).  A materially adverse change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993), *quoted in Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).   Examples of materially adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  *Id.*  "The key . . . is that the plaintiff must show that the [employer's action] created a 'materially significant disadvantage.'"  *Galabya*, 202 F.2d at 641 (quoting *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994)).

The adverse employment action alleged by plaintiff in this case is that her working conditions were made so intolerable, and she was treated so unfairly and arbitrarily with respect to her work performance that she was forced to resign.  As alluded to above, these allegations amount to a claim of constructive discharge.  To defeat summary judgment on such a claim, plaintiff must come forward with evidence sufficient to permit a rational trier of fact to infer that the VNA deliberately created such difficult or unpleasant working

conditions that a reasonable person in her shoes would have felt compelled to resign. *Lopez*, 831 F.2d at 1188.

In *Stetson v. NYNEX Service Co.*, 995 F.2d 355 (2d Cir. 1993), the Second Circuit explained that in order to establish a valid claim of constructive discharge, the employee must show more than just difficult or unpleasant working conditions, dissatisfaction with the nature of her assignments, or the "feel[ing] that the quality of h[er] work has been unfairly criticized . . . ." *Id.* at 360 (citing *Martin v. Citibank, N.A.*, 762 F.2d 212, 221 (2d Cir. 1985); *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325-26 (2d Cir. 1983); *Clowes v. Allegheny Valley Hospital*, 991 F.2d 1159, 1160-61 (3d Cir.), *cert. denied*, 510 U.S. 964 (1993)); *see also, e.g., Young v. Rogers Wells LLP*, 2002 WL 31496205, at *6 (S.D.N.Y. November 6, 2002) ("Giving an employee more work, which could even be perceived as giving 'an employee a chance to excel,' is not an adverse employment action."); *Castro v. New York City Bd. of Educ. Personnel*, 1998 WL 108004, at *7 (S.D.N.Y. March 12, 1998) (employee's embarrassment or anxiety over unsatisfactory ratings, reprimands, and close monitoring does not constitute materially adverse alteration of employment conditions); *Davis v. City University of New York*, 1996 WL 243256, at *7-*8 (S.D.N.Y. May 9, 1996) (no materially adverse change where plaintiff alleged inconvenience and anxiety experienced due to defendant's delay in acting on her tenure and promotion applications). Rather, the employee must show that the employer deliberately made her working environment "so intolerable that her resignation qualified as a fitting response." *Suders v. Pennsylvania State Police*, 542 U.S. 129, ___, 124 S.Ct. 2342, 2347 (2004).

In this case, plaintiff testified at her deposition that she resigned because she felt embarrassed and disrespected by her department (Appx. E, p. 114), and "because of the illness I had. I couldn't take the torture. I was going through stress. They were picking with me, I couldn't take that anymore" (Item 34, Ex. L, p. 118). She also states in her affidavit that the VNA:

• refused her requests for relief from the state aid application work while accommodating Caucasian employees' requests for relief when they were temporarily disabled;

• failed to adequately train her for the state aid work even though they knew she was having trouble focusing and understanding job functions due to her illness;

• criticized her for errors more harshly than they criticized Caucasian employees who made similar errors;

• blamed her for errors made by other employees;

• allowed a Caucasian co-worker to criticize and verbally abuse her;

• placed her on a performance improvement plan (PIP), which they did not do to similarly situated Caucasian employees in the Finance Department; and,

• denied her the union representation to which she was entitled.

(Item 31, ¶ 139).

When taken as true and considered in the light most favorable to plaintiff, these allegations present circumstances which could be found by a rational juror to reflect working conditions so difficult or unpleasant as to permit an inference that a reasonable person in plaintiff's position would believe she was forced to resign. To counter these claims, defendant contends that plaintiff did not specifically request relief from the state aid work,

nor did she present any medical documentation suggesting that further accommodation beyond the 40-hour-per-week limitation was necessary to allow her to perform her job duties.  Defendant also argues that plaintiff's overall workload did not increase when she was assigned the state aid application duties since her remaining cash-posting duties were transferred to another employee.  In addition, defendant contends that plaintiff received approximately two weeks of training in how to complete the state aid applications, and was offered additional training but refused it.

These conflicting contentions illustrate the factual issues remaining with respect to the question whether the VNA's treatment of plaintiff amounted to an adverse employment action.  When considered in conjunction with the totality of the circumstances presented on this motion, the court cannot conclude as a matter of law that plaintiff has failed to make the minimal showing necessary to satisfy this element of her *prima facie* case.

Based on this analysis, the court finds that genuine issues of material fact exist precluding summary judgment in defendant's favor at the *prima facie* stage of plaintiff's disability discrimination claim.  According to the *McDonnell Douglas* order and allocation of proof, plaintiff has met her minimal burden of production, and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.

## IV.   Nondiscriminatory Reason, Pretext, and Intentional Discrimination

In *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47 (2d Cir. 1998), the Second Circuit explained that the employer's *McDonnell Douglas* burden of production "also is light."  *Id.* at 52.

The employer need not *persuade* the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior.  If the employer furnishes such a reason, the *McDonnell Douglas* analysis is complete–"[t]he presumption [of discrimination], having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture."  The ultimate burden then rests on the plaintiff to persuade the factfinder that the employer's proffered explanation is merely a pretext for its intentional discrimination.

*Id.* (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 510-11).

Defendant contends that if the court should find that plaintiff has satisfied her *prima facie* burden, defendant has clearly articulated a legitimate, non-discriminatory reason for its actions–*i.e.*, plaintiff's poor performance.  In this regard, it is beyond dispute that the VNA's decision to place plaintiff on a performance improvement plan was reasonable in light of her long-standing, documented problems with work assignments ever since her transfer to the Finance Department in June 2000 (well before the VNA was aware of her Graves' disease).  The record is clear that rather than terminate plaintiff's employment, the VNA made repeated efforts to adjust her job duties and to provide her with additional training in an effort to help her improve her performance.  Based on this showing, the court has little difficulty concluding that defendant has met its burden of production within the *McDonnell Douglas* framework "to offer a legitimate, non-discriminatory rationale for its actions."  *Terry v. Ashcroft*, 336 F.3d at 138.

Accordingly, any presumption of discrimination created by plaintiff's *prima facie* case "drops out of the analysis," *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 767 (2d Cir. 2002), and to defeat summary judgment plaintiff must produce "admissible evidence . . . show[ing] circumstances that would be sufficient to permit a rational finder of

fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997), *quoted in Terry*, 336 F.3d at 138.   "Thus, once the employer has proffered its nondiscriminatory reason, the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).

In *Fisher v. Vassar College*, the Second Circuit elaborated on the plaintiff's evidentiary obligation at this stage of the summary judgment analysis, as follows:

> [A] plaintiff may prevail only if an employer's proffered reasons are shown to be a pretext *for discrimination*, either because the pretext finding itself points to discrimination or because other evidence in the record points in that direction–or both.  And the Supreme Court tells us that "a reason cannot be proved to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason."  We have recognized again and again that a plaintiff does not necessarily satisfy the ultimate burden of showing intentional discrimination by showing pretext alone.  A finding of pretext may advance the plaintiff's case, but a plaintiff cannot prevail without establishing intentional discrimination by a preponderance of the evidence.

*Fisher*, 114 F.3d at 1339 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 517) (citation and footnote omitted).  The circuit court expressly rejected its prior holding in *Binder v. Long Island Lighting Co.*, 57 F.3d 193 (2d Cir. 1995), in which it had ruled that evidence satisfying the minimal *McDonnell Douglas* requirements of a *prima facie* case, coupled with evidence from which a rational factfinder could find that the employer's explanation for the action it took against plaintiff was false, necessarily required automatic submission of the case to

the jury regardless of whether the evidence in the case reasonably supported the plaintiff's claim that the employer's motives were discriminatory.

Later, in *James*, the Second Circuit reexamined its holding in *Fisher* in light of the Supreme Court's decision in *Reeves v. Sanderson Plumbing*. *Reeves* had rejected the "pretext plus" rule followed by some circuit courts, under which a *prima facie* case of discrimination, combined with sufficient evidence for the trier of fact to disbelieve the defendant's explanation, was routinely deemed "insufficient as a matter of law to sustain a jury's finding of intentional discrimination." *Reeves*, 530 U.S. at 146.  The Second Circuit held:

> [U]pon careful study of the *Reeves* opinion, we can find no indication in it that the Supreme Court has rejected what we said in *Fisher*. We believe that both opinions essentially stand for the same propositions–(i) evidence satisfying the minimal *McDonnell Douglas* prima facie case, coupled with evidence of falsity of the employer's explanation, may or may not be sufficient to sustain a finding of discrimination; (ii) once the employer has given an explanation, there is no arbitrary rule or presumption as to sufficiency; (iii) the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove–particularly discrimination.

*James*, 233 F.3d at 156-57 (footnote omitted).  Thus, by rejecting the "pretext plus" rule, *Reeves* also "impliedly reject[ed] the *Binder* proposition–that evidence satisfying *McDonnell Douglas*'s minimal requirements of a prima facie case plus evidence from which a factfinder could find that the employer's explanation was false necessarily requires submission to the jury." *Id.* at 157.

By way of further explanation, the Second Circuit reasoned that a rule requiring automatic submission to a jury if a plaintiff's case satisfied the minimal *McDonnell Douglas* standard and contained evidence of falsity of the employer's reason was not only

-34-

inconsistent with the Supreme Court's teachings, but also "would illogically permit a plaintiff to prevail notwithstanding the absence of evidence capable of supporting a finding of discrimination." *Id.* at 154. This is because the *prima facie* requirements of *McDonnell Douglas* "are so minimal that they do not necessarily support any inference of discrimination; and there are so many reasons why employers give false reasons for an adverse employment action that evidence contradicting the employer's given reason–without more–does not necessarily give logical support to an inference of discrimination." *Id.* The circuit court recognized that in some circumstances, a *prima facie* showing plus proof of falsity might provide "powerful evidence of discrimination . . . but in others, the two together might fall far short of providing evidence from which a reasonable inference of discrimination could be drawn." *Id.* "The essential point . . . [is] that employers should not be held liable for discrimination in the absence of evidence supporting a reasonable finding of discrimination." *Id.* at 154-55.

Applying these holdings here, and upon close scrutiny of the evidence in the record before the court, it becomes clear that this case belongs in the latter category–plaintiff's minimal *prima facie* showing, combined with her failure to come forward with any evidence from which a factfinder could rationally conclude that the VNA's reasons were false, falls far short of the standards outlined in *Reeves, Fisher,* and *James* for requiring submission of the case to a jury. As the discussion above reveals, plaintiff's *prima facie* showing consists of little more than her claim, supported only by the allegations in the pleadings and her deposition testimony, that the VNA discriminated against her by placing her on a performance improvement plan, increasing her work assignments, and otherwise

deliberately making her working conditions so difficult that she was forced to resign.  In the face of the VNA's clearly articulated and well-documented reasons for the actions it took, plaintiff can point to nothing in the record that might provide a rational basis for the conclusion that those reasons were false.

Nor has plaintiff taken the next step toward meeting her ultimate burden by coming forward with any evidence to support an inference of discrimination on the basis of disability or race.  As discussed, it is undisputed that plaintiff's performance was rated "marginal" in November 2000, and again in December 2000–both before her Graves' disease was diagnosed, and before the VNA could have been made aware that her performance problems might be disability related.  It is also undisputed that the VNA took substantial measures to help her improve her performance by offering additional training and reassigning her to tasks which, at least in the VNA's assessment, were less demanding. Plaintiff can point to nothing in the record to suggest that these measures were taken for discriminatory reasons, or for any reason other than to give her every reasonable opportunity to satisfactorily perform her job in the VNA's Finance Department.

In addition, the VNA has come forward with affirmative proof that its actions toward plaintiff were more likely than not based on legitimate, nondiscriminatory reasons, in the form of the Workers' Compensation Board Panel's January 2004 decision affirming the denial of plaintiff's worker's compensation claim.  As set forth above, the basis of plaintiff's claim was that she suffered work-related stress due to racial discrimination and harassment. After reviewing the evidentiary record developed at the Compensation Board hearing, at which plaintiff testified and was represented by counsel, the Panel determined that the VNA's "good faith personnel decisions" with respect to the reassignment of state aid

application duties actually resulted in a decrease in plaintiff's workload, and that she was afforded assistance and training for the new job duties (*see* Appx. U).  Plaintiff can point to nothing in the record, apart from her own deposition testimony, to dispute this determination.

As stated by the Second Circuit in *Collins v. New York City Transit Authority*, 305 F.3d 113 (2d Cir. 2002), evidence of a determination rendered by an "independent, neutral, and unbiased" tribunal with the power to rule on issues relevant to a federal court employment discrimination action, while not dispositive, may nonetheless be "highly probative of the absence of discriminatory intent" on the part of the employer.  *Id.* at 119 (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60 n. 21 (1974) (determination of how much weight to give a particular arbitration decision is left to court's discretion and depends on facts and circumstances of each case)).  Where the determination "follows an evidentiary hearing and is based on substantial evidence, the [employment discrimination] plaintiff, to survive a motion for summary judgment, must present strong evidence that the decision was wrong as a matter of fact–*e.g.* new evidence not before the tribunal–or that the impartiality of the proceeding was somehow compromised."  *Id.*

Here, plaintiff has failed to present any evidence to overcome the "cumulative probative weight" of the VNA's documented proof of legitimate, nondiscriminatory reasons for its employment action, and  the determination by the Workers' Compensation Board that the VNA acted in good faith.  *Id.*  Upon careful scrutiny of the record, developed after ample time for discovery, the court finds no admissible evidence, beyond the sketchy allegations in the pleadings and plaintiff's self-serving testimony, that would be sufficient to permit a

rational finder of fact to infer that the VNA's conduct toward plaintiff was more likely than not based in whole or in part on discrimination.  Accordingly, no rational juror could find in plaintiff's favor on her ADA claim, however liberally construed, and defendant is entitled to summary judgment dismissing this claim.

## VI.    **Title VII**, **Constructive Discharge and Harassment**

Finally, for the same reasons discussed above with respect to plaintiff's disability discrimination claim, summary judgment in defendant's favor is appropriate dismissing plaintiff's Title VII claim.  To the extent the complaint can be construed to assert separate claims for constructive discharge or harassment, the above discussion amply demonstrates the futility of these claims as well.[7]  Simply put, considering the totality of the facts and circumstances presented on this motion in the light most favorable to plaintiff, and drawing all reasonable inferences in her favor, no rational juror could conclude that the VNA's conduct toward plaintiff was more likely than not based in whole or in part on discrimination.

## <u>CONCLUSION</u>

Based on the foregoing, defendant's summary judgment motion (Item 17) is granted, and the complaint is dismissed in its entirety.

The Clerk of the Court is directed to enter judgment in favor of defendant.

---

[7]In her memorandum in response to defendant's motion for summary judgment, plaintiff requests for the first time in this litigation that the court construe the complaint to include a claim for discrimination or harassment under the FMLA.  The Court declines this request.  As amply demonstrated by the discussion in the text above, no rational juror could find that plaintiff has can sustain her ultimate burden of showing that she suffered an adverse employment action under circumstances giving rise to an inference of discriminatory intent.  *Cf. Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004) (discussing standards for claim of discrimination under FMLA).  Accordingly, it would be futile to allow plaintiff to proceed with such a claim at this stage of the case.

So ordered.

\s\ John T. Curtin
JOHN T. CURTIN
United States District Judge

Dated:   August   31   , 2005

p:\opinions\03-5.aug2405